Filed 9/16/24  In re O.E. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re O.E., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E082366 |
| Plaintiff and Respondent, | (Super.Ct.No. DPIN2300039) |
| v. | OPINION |
| C.E., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Elizabeth Tucker, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed and remanded with directions.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant C.E., father of O.E., appeals from the juvenile court's disposition order adjudging O.E. a dependent of the court and removing her from his custody. (Welf. & Inst. Code, § 300, subds. (b)(1), (d).[1]) He challenges the jurisdictional findings and dispositional order removing her from his custody. He further contends the exit order invalidly conditions modification of custody and visitation upon his completion of a parenting class and individual counseling. We affirm, but remand with directions.

## I. PROCEDURAL BACKGROUND AND FACTS

Father and E.K. (mother) are the parents of O.E. (born in 2016). They are divorced and do not have a good co-parent relationship. O.E. lives with mother and spends three weekends each month with father.

On February 1, 2023, the Department of Public Social Services (DPSS) received a referral with allegations of general neglect and sexual abuse. Father was living with his girlfriend and her son, N.R. N.R. accused father of sexual (touching) and physical abuse. He claimed that father threatened to tie him up if he moved while father was touching his penis. There were concerns that N.R. was coached because he changed his story during the forensic interview. O.E. told mother that she and father bathed together and both were nude. Mother reported O.E. urinates in bed after visiting father, and father refused to allow mother to schedule any therapy (via Barbara Sinatra Center) or doctor appointments for O.E. At her forensic interview on February 15, 2023, O.E. disclosed that when she was in the shower, father touched her vaginal and anal areas by using his

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

hands and moving them forward and backward; he did not use soap or wash any other part of her body.

The social worker met with father on February 21, 2023. He acknowledged a prior domestic violence charge, but stated he was acquitted of it. Father denied abusing N.R. or touching O.E. inappropriately. He stated O.E. did not require help with changing or showering; however, he "helped [her] clean her private areas when she has soiled herself." He admitted to sitting on the toilet and talking to her while she showered. The social worker advised him to refrain from washing her private areas and to allow her to clean and wash herself. Father agreed to accept the advice. He also agreed to allowing mother to enroll O.E. at the Barbara Sinatra Children's Center, which is "dedicated to ensuring every child's right to a normal, healthy and secure childhood." (<https://barbarasinatrachildrenscenter.org> [as of Sept. 4, 2024].)

On March 1, 2023, dependency proceedings were initiated pursuant to section 300, subdivisions (b)(1) (failure to protect) and (d) (sexual abuse). DPSS alleged that physical abuse allegations against father involving another child were substantiated and O.E. disclosed father touched her vaginal and anal area while washing her.[2] The juvenile

---

[2] Specifically, DPSS alleged, "During a forensic interview on February 15, 2023, the child, who is able to bathe without assistance, reported her father touched her vaginal and anal area while washing her and did not wash any other part of her body. Furthermore, the mother reported that the child has frequent bedwetting accidents. Additionally, the mother disclosed the father was part of a recent San Bernardino County child welfare investigation alleging physical and sexual abuse to another minor, who was removed from the home. *The physical abuse allegations against the father were subsequently substantiated.* Such actions place the child at risk of suffering serious physical harm."

3

court found a prima facie showing that O.E. came within section 300, subdivisions (b) and (d), but ordered her to remain in parents' custody. An amended petition was filed on April 20, 2023.

According to the jurisdiction/disposition report filed April 21, 2023, DPSS recommended O.E. be declared a dependent of the court, that she be removed from father's care but remain in mother's care, both parents receive services, and father's visitation be supervised. The family's prior child welfare history includes substantiated claims of general neglect and physical abuse against father. On November 13, 2017, father forcefully took O.E. from mother and was arrested for domestic violence, child endangerment and felony threats, and on November 7, 2022, father physically abused his girlfriend's son.

The social worker interviewed O.E. on April 17, 2023. She denied anyone touching her private parts outside of the shower and stated father had stopped touching her. Mother was also interviewed; she was not surprised that father was accused of sexually touching and beating another child because he has a history of saying "weird things" like telling O.E. that she "used to be inside of him and how he put himself inside of [mother] to make [her]." When the mother asked father why he told this to O.E., he replied, "[W]ell, there is nothing better to do."

On April 19, 2023, the social worker discovered the open case involving N.R. in San Bernardino County. According to court documents, N.R. reported ongoing, daily physical and sexual abuse by father. He claimed that father would punch him, yank his penis, use a rope to tie him down, and withhold food and mock him for not eating as

4

forms of discipline. Later, during a forensic interview, N.R. recanted the statements and claimed his biological father had asked him to lie. Because of father's aggressive physical discipline and inappropriate touching, the child was removed from his mother's care.

The juvenile court found a prima facie showing to detain and remove O.E. from father only and suspended father's visitation pending the contested jurisdictional hearing.

According to the addendum reports filed May 26 and August 3, 2023, DPSS recommended O.E. be declared a dependent of the court, physical custody remain solely with mother, and the juvenile court deny physical custody, reunification services, and visitation for father. On May 15, the social worker spoke with O.E., who was doing well. She had not visited father, who she referred to as "Joshua Tree Dad," in a while and "was indifferent as to visitation" with him. The social worker emailed father and asked for updated contact information; however, she received no response. On July 31, 2023, the social worker spoke with mother who reported having concerns regarding O.E.'s recent behavior. O.E. had told mother about "visions" she was having that involved her lying down on father's bed when he suddenly would begin to stab her. The social worker was unable to speak with father who "redirected [her] to his attorney to set up a time with the attorney." The social worker requested an integrated referral for counseling services on behalf of O.E.

In its addendum report filed October 4, 2023, DPSS recommended O.E. be declared a dependent of the court, mother be granted sole physical and legal custody, father be denied physical custody and visitation, and upon the filing of the family law

5

orders, the juvenile court terminate this dependency. The social worker interviewed O.E. on August 17, 2023. She stated she had not seen father in a long time, which made her sad because she missed him; however, she explained that she did not see him because he had done "some things." She was unable to talk about what "things" father had done because it was difficult for her to talk about it and saying it out loud made her emotional. O.E. reported she sometimes has difficulty sleeping and has scary dreams about father (standing over her and stabbing her). She stated she does not feel safe with him because "he doesn't feel like home." In September 2023, the social worker spoke with mother who reported that O.E. had been hospitalized for an infection in her kidney; she has a history of ongoing UTI's and had one about a month earlier.

At the jurisdictional hearing, father's girlfriend, Ms. R., testified she has been with father for two years, they have lived together since May 2022 (except for a period when her son, N.R., was removed), and she has observed O.E.'s bathing routine. Ms. R. stated that O.E. typically took a shower and would call for father if she needed help adjusting the water, choosing a shampoo, or getting a towel. Ms. R. was not physically present in the bathroom with them, but she "could hear what was going on." She never observed any inappropriate behavior by father with O.E. Regarding O.E. wetting the bed, Ms. R. said it happened on an "occasion or two" at the beginning of the relationship (between Ms. R. and father) but ended when they made sure that she went to the restroom before going to bed. O.E. had her own bed, but shared a room with N.R.

Mr. V., the social worker from the dependency case involving N.R., testified that N.R. underwent a forensic medical exam and interview that disclosed sexual and physical

abuse by father. He was removed from both parents. According to Mr. V., N.R. said that father, on a weekly basis, tied him up with a rope to the ceiling fan, poked him, and pulled on his penis. N.R. accused father of punching him in the stomach hard enough to knock the wind out of him. As a result of the forensic interview, San Bernardino County Child and Family Services "found it more than likely that the child was abused, and . . . either parent either knew or should have known something was going on and failed to protect the child." Mr. V. acknowledged that N.R. recanted his accusation, but found the recantation to be concerning because N.R. said, "I don't know why I say these things. My brain is just really confused."

Mr. V. testified that mother was concerned about a visit O.E. had with father where they went on an extended vacation. Mother had no contact with O.E. during the entire vacation, and when she returned home, she did not want her picture taken, was not acting like herself, was wetting the bed, and had a UTI. When mother asked father about O.E.'s behavior, he did not provide a satisfactory answer as to why O.E. was behaving differently.

The father called O.E. to testify. Shortly after taking the stand, she put her head down, appeared sad, and started to cry. Her attorney objected to her testifying, and father's counsel waived questioning her. The juvenile court found it would be psychologically harming to continue questioning her, and her testimony is unnecessary because there is a transcript of her forensic interview.

Ms. R.'s mother, S.M., testified that she had a relationship with O.E., whom she babysat and spent time with. S.M. said that O.E. loved father and "was always hanging

7

on him, climbing on him." S.M. observed O.E.'s bathing routine—she would go into the bathroom to take a shower and call father who would sit on the toilet seat, tell her stories, and talk to her. When he asked if he could leave, she would say, "No, stay." S.M. never saw father help O.E. bathe; however, she did not physically watch him the entire time they were in the bathroom. Approximately every other month from Spring to September in 2022, S.M. would tell O.E. that if someone touched her and she felt uncomfortable she should tell S.M. who would make sure it stopped.

Mother testified that the first time O.E. started wetting the bed was in 2020 after she visited father when he was living in North Dakota.[3] Mother took O.E. to see a medical doctor for both bedwetting and "withholding behavior." The doctor's response was that it may be something she needed to outgrow. Thus, mother would have O.E. go to the bathroom before going to sleep, and then wake her up in the night to go to the bathroom again. The bedwetting was an ongoing issue that happened about once a week with the most recent incident being the week prior to the hearing. Mother told the therapist at Barbara Sinatra Children's Center about O.E.'s bedwetting and reported that she was "displaying behaviors that shouldn't be there especially at this age, and she's saying certain things that she should not be saying at her age." Mother said that O.E. would tell her, "My dad told me that I was inside of him, and that he put her inside of [mother]. . . . And then also that [mother] made milk from [her] boobies." O.E. also

_____

[3] According to mother, father never acknowledged that O.E. had bed-wetting incidents at his house.

8

revealed that during a visit in North Dakota, father sat in the bathtub with her, one time naked and the other time in his boxers or shorts.

According to mother, the family law court ordered therapy for O.E., but father did not sign the consent form until after the accusations were made in this case. Mother never read, nor was given, the transcript of O.E.'s forensic interview, and she was not aware of whether O.E. denied some of the allegations. O.E. never asked for father, but mother allowed her to see him in a public setting such as the court hallway.

Upon further examination, mother stated that O.E. was able to bathe on her own by the time she was five years old. She did not need help when she cleaned up from wetting the bed or soiling herself. After the doctor's visit in early February 2023, O.E. said she did not "like the fact that the doctor had to do what he had to do." Mother explained that the doctor was trying to take care of her but nobody else is supposed to touch her private area. In response, O.E. said, "'My dad touches me there sometimes.'" When mother asked, "What?" O.E. said, "Nothing," and ran to the next room. Mother did not push the issue, but called the social worker and then filed an ex parte in the family law court seeking to change custody.[4]

On October 12, 2023, after reading and considering all the reports, the witnesses' testimonies, and the evidence presented, the juvenile court found "the allegations in b-1 and d-1 true." The court adjudged O.E. a dependent of the court, removed her from father's custody, granted mother sole physical and legal custody, and ordered monthly

---

**4** She dismissed the ex parte application because she "was told it would be handled" in this dependency action.

supervised visitation for father, with the recommendation he complete a parenting class and possibly individual therapy. The dependency would terminate upon the filing of family law orders.

## II. DISCUSSION

### A. *Jurisdiction.*

Father contends there was insufficient evidence to support the juvenile court's jurisdictional findings. We disagree.

"'The purpose of California's dependency law is "to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." [Citation.] In its effort to achieve this overarching goal, the law balances a number of vital interests: children's interests in safe and stable homes; parents' interests in raising their children; families' shared interests in each other's companionship; and the state's interest in protecting society's most vulnerable members.' [Citation.] [¶] 'Dependency proceedings span up to four stages: jurisdiction, disposition, reunification, and permanency. [Citations.] At the jurisdictional stage, the juvenile court determines whether to declare a child a dependent of the court because the child is suffering, or at risk of suffering, significant harm.' [Citation.] '"A dependency adjudication is a preliminary step that allows the juvenile court, within specified limits, to assert supervision over the endangered child's care." [Citation.] After the juvenile court takes that preliminary step, the court may impose limitations on parental authority as necessary

10

to protect the child.  [Citations.]  It may also order that the child be removed from a parent's physical custody if there is clear and convincing evidence that removal is necessary to protect the child from a substantial risk of harm.  [Citations.]  In some cases, a dependency adjudication may lead to termination of parental rights.'  [Citation.]" (*In re N.R.* (2023) 15 Cal.5th 520, 537.)

Relevant to this case, the juvenile court may adjudge the child to be a dependent of the court under section 300, subdivision (b)(1) (failure to protect) and subdivision (d) (sexual abuse).  Here, the court sustained the allegations in the petition under both of these subdivisions, and the allegations were essentially the same—that physical abuse allegations against father involving another child were substantiated and O.E. disclosed that father touched her vaginal and anal areas while washing her, but did not use soap or wash any other part of her body.  Because the factual basis is the same, and we may affirm a jurisdictional ruling if the evidence supports any of the counts, we will discuss the allegations that support jurisdiction under section 300, subdivision (d).  (See *In re Christopher C.* (2010) 182 Cal.App.4th 73, 83 [juvenile court's jurisdiction may rest on a single ground]; see also *In re Tracy Z.* (1987) 195 Cal.App.3d 107, 112-113 [single finding sufficient to sustain jurisdiction].)

We review the jurisdictional findings for substantial evidence.  (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 170.)  "The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 916.)

Section 300 provides, in relevant part, as follows: "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶] (d) The child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by the child's parent or guardian or a member of the child's household." Here, at her forensic interview on February 15, 2023, O.E. disclosed that when she was in the shower, father touched her vaginal and anal areas by using his hands and moving them forward and backward; he did not use soap or wash any other part of her body. If believed, the child's disclosures reveal sexual abuse under section 300, subdivision (d). Father contends otherwise.

Father asserts that his actions amounted to nothing more than normal caretaker responsibilities as defined in Penal Code section 11165.1, subdivision (b)(4), and since the juvenile court "never once mentioned [this] exception[,] . . . it cannot be assumed that the court knew of the exemption or considered it in its ruling on the petition." According to father, "[b]ecause [O.E.] sat in soapy bath water, there was no reason for [him] to wash other parts of her body except the privates to ensure these parts were clean too." Alternatively, he argues there is insufficient evidence to support the allegation under section 300, subdivision (d), because "the record shows all [O.E.] ever described to the forensic examiner . . . was that her father washed her privates during her baths when he sat on the toilet fully clothed and reached out half hand to wash it with soap—while [Ms. R.] and [N.R.] were home." Moreover, he points out that DPSS deemed the sexual abuse allegation against him to be inconclusive, and contends mother's testimony about O.E.'s

12

prior bedwetting and reaction to "the intrusive medical examination," do not support the sexual assault allegations.

As the People note, father misstates the evidence and the record. O.E. stated she was in the shower, not sitting in a soapy bath, when father touched her. O.E.'s attorney directed the juvenile court's attention to the normal caretaker responsibilities exception (Pen. Code, § 11165.1) and argued that it did not apply because O.E. stated that she is able to, and does, clean herself when she is at mother's home. Also, the petition alleged a "substantial risk that the child will be sexually abused, as defined in subdivision (b) of section 11165.1 of the Penal Code, by his or her parent . . . ." While the court may not have specifically stated that it considered the normal caretaker responsibilities exception, its finding that father's behavior constituted a violation of section 300, subdivision (d), implies that it did.

In challenging the evidence to support the jurisdictional finding, father reevaluates the evidence and the credibility of the witnesses. Father points to other evidence—DPSS's finding the sexual abuse allegation to be conclusive, mother's testimony about O.E.'s bedwetting, and O.E.'s reaction to the medical examination—and reargues the conflicts in the evidence in the manner most favorable to him. He further focuses on O.E.'s statement, "He was cleaning me," along with her denial of any abuse of N.R. or herself, while ignoring or discounting evidence of her bedwetting after returning from visits with him, and allegations of father's abuse of N.R. In order to accept father's argument that the juvenile court's findings are not supported by the evidence, we would

13

have to resolve factual disputes, conflicting inferences, and questions of credibility against the finding of jurisdiction.

As the reviewing court, "[w]e do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 228.) Instead, we view the record in the light most favorable to the juvenile court's findings and determine whether they are supported by substantial evidence. (*In re Yolanda L*. (2017) 7 Cal.App.5th 987, 992.) Here, the juvenile court stated that it was basing its "finding predominantly on the forensic interview and some of the collateral information regarding the bed wetting." This constitutes substantial evidence of sexual abuse and sufficiently supports the court's jurisdictional finding. (See *In re Alexis E*. (2009) 171 Cal.App.4th 438, 451 ["Evidence from a single witness, even a party, can be sufficient to support the trial court's findings."].) Thus, father has not met his "burden of showing that there is no evidence of a sufficiently substantial nature to support the order." (*In re Cole C*., *supra*, 174 Cal.App.4th at p. 916.)

*B. Removal.*

Section 361, subdivision (c), """"is clear and specific: Even though children may be dependents of the juvenile court, they shall not be removed . . . unless there is clear and convincing evidence of a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being and there are no 'reasonable means' by which the child can be protected without removal."" [Citation.] [¶] A finding of parental abuse cannot alone provide the clear and convincing evidence necessary to justify removing a child. [Citations.] Rather, the juvenile court must determine whether a child

14

will be in substantial danger if permitted to remain in the parent's physical custody, considering not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention. [Citations.] [¶] 'On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that the [juvenile] court was required to make its order based on the higher standard of clear and convincing evidence.' [Citations.]" (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.)

Relying on "all the reasons argued in detail under Argument I, fully incorporated herein," father contends there was insufficient evidence to support the removal order under section 361, subdivision (c)(1), and claims neither DPSS nor the juvenile court evaluated the section 361 factors or considered whether there were any reasonable alternatives to O.E.'s removal from his custody.[5] He also faults the court for "never mention[ing] that the applicable standard was clear and convincing evidence, nor [stating] its reasons for the order." He maintains that "in the absence of the required statement of the facts on which the decision to remove the child was based," the record fails to support the removal order.

To begin, we deem father's challenge to the juvenile court's failure to state the applicable standard or its reasons for the order to be waived for failure to object below. "'"An appellate court will ordinarily not consider procedural defects or erroneous rulings

---

[5] According to father, reasonable alternatives include: "an order that [he] no longer help [O.E.] bath, . . . unannounced visits on his overnight weekends, or order for [him] to complete parenting classes, or conjoint counseling with [O.E.] that would have resolved any issues regarding [his] helping her during the baths."

15

in connection with relief sought or defenses asserted, where an objection could have been, but was not, presented to the lower court by some appropriate method." [Citation.]' [Citation.] This is the general rule, because any other rule would allow a party to deliberately stand by in silence and permit the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable." (*In re G.C.* (2013) 216 Cal.App.4th 1391, 1398.) Here, an "objection would have . . . ensured that the court made the required findings. Instead of raising these procedural matters in the [juvenile] court, father now belatedly seeks to avoid a result that turned out to be unfavorable. Accordingly, we will not consider this issue for the first time on appeal." (*Id*. at p. 1399.)

Notwithstanding the above, we are not persuaded by father's argument. The juvenile court's failure to state the applicable standard or its reasons for the order was harmless error given the court's prior finding that O.E. comes within the provisions of section 300, subdivisions (b) and (d), along with its decision "to follow the recommendations . . . in the October 4th addendum." Relying on O.E.'s "forensic interview and some of the collateral information regarding the bed wetting," the court declared O.E. a dependent, removed custody from father pursuant to section 361, subdivision (c)(1), and awarded mother sole physical and legal custody. Rejecting DPSS's request, the court refused to make a finding of detriment, and authorized visitation, "one time a month, two hours, supervised, with the recommendation that father complete a parenting class and possibly individual therapy. And he obviously can approach family law with a request to increase visitation."

16

Based on the juvenile court's statements, it is not reasonably probable that its ruling would have changed had father objected and asked the court to state the facts underlying this finding.  (See *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218 [stating harmless error standard].)  Rather, in all likelihood, the court would have reiterated the evidence in support of its jurisdictional finding (O.E.'s forensic interview and collateral information regarding her bed-wetting) and noted that father (1) had already been advised to refrain from washing O.E.'s private areas and allow her to wash herself, and (2) had told a social worker that he was not open to therapy.  Accordingly, we reject father's challenges to the removal order.

*C. Exit Order.*

In setting the exit order, the juvenile court stated, "One time a month supervised with the authorization that that can be increased upon completion of a parenting class and that that would be—though he would have to do that through family law because upon the filing of the custody orders, which [mother's counsel is] going to file, this dependency case is going to be terminated."  Father's counsel asked if the court would "reconsider about the hours [of visitation]?"  The court replied, "What's your suggestion, [counsel]?  Before you tell me, it's going to be limited because . . . part of the order will be that upon completion of a parenting class, it can be increased.  So I agree two hours a month is not very much visitation.  What is your suggestion?"  Subsequently, the court stated, "[Visitation] . . . one time a month, two hours, supervised, with the *recommendation* that father complete a parenting class and possibly individual therapy.· *And he obviously can approach family law with a request to increase visitation.*"

17

The minutes of the October 12, 2023, jurisdictional hearing state the juvenile court ordered "[v]isitation for the father to be 1 time per month for 2 hours, supervised by an agreed upon 3rd party. . . . [¶] *Court authorizes increased visits for the father, upon completion of a parenting class through Family Law and individual counseling*."

Citing section 302, subdivision (d), and *In re Cole Y*. (2015) 233 Cal.App.4th 1444, 1456 (*Cole Y*.), father argues the juvenile court's exit order invalidly conditions modification of custody and visitation upon his completion of a parenting class and individual counseling. We agree.

Section 302, subdivision (d), provides "[a]ny custody or visitation order issued by the juvenile court at the time the juvenile court terminates its jurisdiction . . . shall be a final judgment and shall remain in effect after that jurisdiction is terminated. The order shall not be modified in a proceeding or action described in Section 3021 of the Family Code unless the court finds that there has been a significant change of circumstances since the juvenile court issued the order and modification of the order is in the best interests of the child." In *Cole Y*., the juvenile court issued an exit order that granted sole physical custody to the mother because father endangered the child by "putting him in the care of [a drug user]." (*Cole Y*., *supra*, 233 Cal.App.5th at p. 1451.) The court stated that "'in order to modify the court's orders, . . . Father will have to complete . . . a full drug program with weekly testing, a parenting program and individual counseling.'" (*Ibid*.) The Court of Appeal held that, under section 302, subdivision (d), the juvenile court did not have the authority to condition the family court's modification of an exit order upon a parent's completion of certain programs. (*Cole Y*., at p. 1456.)

18

Here, the record on appeal fails to include a copy of the family law order (Judicial Council Forms, form JV-200).  At oral argument, counsel for DPSS represented that the JV-200 order mimics the October 12, 2023, minute order ("Court authorizes increased visits for the father, upon completion of a parenting class through Family Law and individual counseling.").  However, the written order is contrary to the court's oral pronouncement of the terms of disposition, which specifically provides:  "[Visitation] . . . one time a month, two hours, supervised, with the *recommendation* that father complete a parenting class and possibly individual therapy.· *And he obviously can approach family law with a request to increase visitation*."  The oral pronouncement controls.  (*In re Karla C*. (2010) 186 Cal.App.4th 1236, 1259-1260, fn. 9.)  Because of the conflict, the exit order conditioning increased visitation upon completion of a parenting class and individual counseling is remanded to the juvenile court to be conformed to its oral pronouncement.

## III. DISPOSITION

The exit order conditioning increased visitation upon completion of a parenting class and individual counseling is remanded to be conformed to the juvenile court's oral pronouncement of disposition.  Otherwise, the dispositional order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                            Acting P. J.


We concur:


MILLER
                    J.


MENETREZ
                    J.